**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYVLANIA**

| | |
|---|---|
| TIKIA BRANCH | : |
| | : |
| *Plaintiff,* | : |
| | : Civil Action No. |
| v. | : |
| | : **JURY TRIAL DEMANDED** |
| NORTHEAST FENCE & IRON WORKS | : |
| INC. | : **ELIGIBLE FOR ARBITRATION** |
| | : **UNDER L.R. 53.2** |
| *Defendant.* | : |

**CIVIL ACTION COMPLAINT**

1.      Plaintiff Tikia Branch files this Civil Action Complaint against Defendant Northeast Fence & Iron Works Inc. under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, for hostile work environment and constructive discharge on the basis of sex.  In support thereof Plaintiff alleges as follows:

**PARTIES**

2.      Plaintiff Tikia Branch is a woman who resides in Philadelphia, Pennsylvania.

3.      From on or about April 15, 2024 until August 8, 2025, Branch was employed by Northeast Fence & Iron Works, Inc. ("Northeast Fencing").

4.      Northeast Fencing is a fencing company serving Philadelphia, Bucks County, Montgomery County, and parts of New Jersey, specializing in wrought iron gate design and all types of fence installation, as well as fabrication of iron stair railings and aluminum deck railings.

5.      At all material times, Northeast Fencing had more than fifteen full-time employees and was an employer within the meaning of Title VII.

6.      At all material times, Branch was an employee within the meaning of Title VII.

1

**JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7.     This Court has subject matter jurisdiction based on federal question jurisdiction under 28 U.S.C. § 1331.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Northeast Fencing's principal place of business is located at 8451 Hegerman Street, Philadelphia, PA 19136, and the events giving rise to the cause of action occurred in this district.

9.     On or about December 17, 2025, Branch timely filed a charge of discrimination, Charge No. 530-2025-08994, with the Equal Employment Opportunity Commission ("EEOC"), which was also dual filed with the Philadelphia Commission on Human Relations.[1]

10.     Branch's Charge stated that she suffered harassment and was constructively discharged because of her sex.

11.     On December 29, 2025 the EEOC issued Branch a notice of her right to sue, and this case has been brought within 90 days of receipt.

12.     Branch has exhausted her administrative remedies under Title VII.

**FACTUAL ALLEGATIONS**

**Job Background**

13.     At its location at 8451 Hegerman Street, Philadelphia, PA 19136, Northeast Fencing has a factory, main office, and a yard where materials are stored.

14.     Plaintiff Tikia Branch was hired by Northeast Fencing and began working as a Yard Worker on or about April 15, 2024.

---

[1] Plaintiff intends to amend the complaint to add additional discrimination claims under state and local statutes once exhausted. Such claims are based on the same set of facts and fall within this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

2

15.     After approximately three months, Branch moved onto the factory floor and began working on the fabricating team in the section of the warehouse referred to as the "Pit."

16.     At all relevant times, out of the approximately 40 to 50 employees who worked on the factory floor, Branch was the only female.

17.     At all relevant times, Branch met or exceeded the expectations for her position, and she was never subject to discipline or cited for infractions during her employment with Northeast Fencing.

18.     Consistent with her strong performance, Branch received an employee of the month award in or around August 2024.

19.     Branch reported to Donnie Cabello, who was the manager of the fabricating team.

20.     Throughout Branch's employment she was subjected to offensive jokes, comments, and flirtatious remarks, including derogatory comments about her sexual orientation, and sexually explicit comments and behavior from coworkers and supervisors.

21.     As part of the fabricating team, Branch generally had to attend both a morning meeting and a meeting in the early afternoon to review upcoming tasks and logistics.

22.     Those meetings took place in the office of Branch's manager, Cabello.

23.     Cabello shared his office with David Keenan, who was the supervisor of another team referred to as the "Iron Shop."

24.     Both Cabello and Keenan had managerial authority including the ability to discipline and fire factory employees.

25.     Both Cabello and Keenan were regularly in attendance at the meetings.

26.     During these daily meetings, Keenan would frequently make inappropriate sexual comments about men's genitals and describe sexual acts in graphic detail.

27.     Keenan would also tell inappropriate stories about sexual acts he had engaged in personally.

28.     Keenan repeated the same sexually explicit stories numerous times.

29.     Keenan also made comments about Branch being gay, including jokes about sexual "top or bottom" roles.

30.     These repeated comments and stories created an extremely uncomfortable environment for Branch as a woman and as a lesbian employee.

31.     These comments were unwelcome and pervasive.

32.     Branch was also subjected to unwelcome flirtatious remarks from her colleagues on the factory floor, who were all male.

33.     Early in Branch's employment, one coworker – an entry-level employee who had just started – proposed to her and told her he was "God."

34.     Branch reported the issue to management and the coworker was subsequently terminated.

35.     However, Northeast Fencing failed to take any remedial action with respect to the other harassment Branch experienced.

36.     For instance, Keenan made a number of harassing comments that had resulted in complaints from others without any corrective or remedial action by management whatsoever.

37.     Keenan is the brother of Steve Vendetti, Jr., who is the General Manager of Northeast Fencing.

38.     During all-staff meetings, the General Manager Vendetti indicated that he was aware of complaints about his brother, Dave Keenan, but stated that Dave "was not going anywhere."

39. Branch understood these comments to mean that any further complaints about Keenan would not be addressed.

40. Since there was no women's restroom in the factory, Branch used the restroom in the main office throughout the majority of her employment.

41. Branch never complained about this arrangement or asked for another option.

42. In or around May 2025, Branch began hearing from several employees that management was planning to convert a storage closet near the men's restroom into a "private bathroom" for her use.

43. Branch was alarmed because she had been using the restroom in the main office since she started at Northeast Fencing, and there was no explanation for why management felt that she should use another bathroom instead of the one in the main office.

44. Around July 28–29, 2025, management told Branch the converted closet bathroom was ready.

45. When the storage closet conversion to a bathroom was complete, Branch had an interaction with the General Manager Vendetti while she was going to use the restroom in the main office.

46. Vendetti informed her that she now had her own bathroom, indicating that she should no longer be using the main office restroom.

47. However, the bathroom that had been converted from a closet for Branch was unsanitary, the toilet area was in poor condition, and the door had no functioning lock.

48. The stripped door could be pulled open by anyone while Branch was inside.

49. Despite management telling Branch this restroom was for her use only, her male coworkers immediately began using it.

5

50. They urinated on the toilet seat and left the bathroom dirty.

51. Branch reported these incidents to her supervisor, Cabello, who brushed it off, and asked Branch if she was going soft on him.

52. Cabello told Branch he would inform the main office about Branch's concerns regarding the bathroom.

53. Despite this representation, management did not take any corrective actions.

54. Corrective actions could have included holding a meeting to tell Branch's colleagues not to use her restroom or installing a functioning lock.

55. On August 6, 2025, Branch's coworker named Mike, who had previously shown interest in Branch, walked in on her while she was using the bathroom.

56. Mike did not knock and he opened the door abruptly, as Branch had just pulled up her pants.

57. Branch reported this incident to Cabello and again asked that management install a lock.

58. Cabello said he would speak to the office, but again no action was taken.

59. On August 8, 2025, around 1:15 p.m., Mike walked in on Branch again.

60. This time Branch was fully exposed, squatting over the toilet while changing her sanitary napkin.

61. Mike knocked lightly but immediately opened the door, looked at Branch, and said, "Damn girl."

62. Branch yelled out in shock.

63. Mike shut the door and apologized, claiming he was bringing her air freshener.

64. Earlier that morning, however, Mike had informed Branch that he had already placed Febreze in the bathroom, so his explanation did not make sense.

65. When Branch exited the restroom, Mike was standing outside waiting for her.

66. Mike smirked and asked, "Was that a tattoo I saw?"

67. Branch was extremely upset and tried to locate her manager, Donnie Cabello, to report the second incident, but he was nowhere to be found.

68. These restroom incidents, combined with the other harassment Branch regularly endured and management's repeated failure to act, created conditions in which Branch did not feel safe or secure and rendered the workplace intolerable.

69. Because she could not locate her manager, Branch instead told the lead welder what happened and left work, which effectively ended her employment with Northeast Fencing.

70. Shortly after Branch left, the company canceled her health insurance without letting her know, causing further financial hardship.

71. Branch was subjected to a hostile work environment and constructive discharge on the basis of sex.

## COUNTS

### COUNT I: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII ON THE BASIS OF SEX

72. Plaintiff repeats and incorporates by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

73. Branch suffered intentional discrimination based on her sex (inclusive of her gender and her sexual orientation).

74. The discrimination was severe.

75. The discrimination was pervasive.

7

76. The discrimination detrimentally affected Branch and would detrimentally affect a reasonable person in like circumstances.

77. The discrimination adversely affected the terms and conditions of Branch's employment at Northeast Fencing.

78. Northeast Fencing knew or should have known of the harassment and failed to take prompt and appropriate remedial action.

79. Northeast Fencing acted with malice or reckless indifference with respect to Branch's federally protected rights.

80. Northeast Fencing is therefore liable for Branch's hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

## COUNT II: CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII ON THE BASIS OF SEX

81. Plaintiff repeats and incorporates by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

82. Branch suffered intentional discrimination based on her sex.

83. The discrimination was severe.

84. The discrimination was pervasive.

85. Northeast Fencing was aware of the discrimination and failed to take prompt remedial action.

86. Northeast Fencing knowingly permitted conditions of discrimination in employment so intolerable for Branch that a reasonable person subjected to the conditions would have resigned.

87. Branch was constructively discharged from Northeast Fencing.

8

88.     Northeast Fencing acted with malice or reckless indifference with respect to Branch's federally protected rights.

89.     By permitting conditions of employment to persist that were objectively so intolerable that a reasonable person in Branch's position would have resigned, Northeast Fencing constructively discharged Branch in violation of Title VII of the Civil Rights Act of 1964.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in her favor, and against Defendant, in the form money damages not in excess of $150,000, as well as interest and costs, including:

  i.     Actual damages, including backpay and/or front pay for lost wages and lost benefits, including health insurance benefits;

  ii.    Non-economic compensatory damages for emotional distress, including mental anguish;

  iii.   Punitive damages;

  iv.    Statutory penalties;

  v.     Attorneys' fees;

  vi.    Litigation costs and interest; and

  vii.   Such additional relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff requests a trial by jury on all of her claims.

**Date:**  March 27, 2026                    Respectfully submitted,

                              **GOLDSHAW GREENBLATT PIERCE LLC**

                              */s/ John L. Hensler*
                              John L. Hensler (PA Bar No. 329075)
                              Two Penn Center, Suite 1230
                              1500 JFK Boulevard
                              Philadelphia, PA 19102
                              (215) 978 -9090
                              *Attorneys for Plaintiff*